IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Brodal Farms, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING** |
| | ) | **DEFENDANT'S MOTION TO** |
| vs. | ) | **COMPEL ARBITRATION** |
| | ) | |
| Archer-Daniels-Midland Company, | ) | Case No. 1:21-cv-203 |
| | ) | |
| Defendant. | ) | |

Before the Court is the Plaintiff's motion for termination of arbitration proceedings and the Defendant's motion to compel arbitration. <u>See</u> Doc. Nos. 1-2, p. 4, and 4. Both motions have been fully briefed. <u>See</u> Doc. Nos. 1-2, p. 5, 5, 9, and 15. For the reasons set forth below, the Plaintiff's motion is denied and the Defendant's motion is granted.

I.     <u>**BACKGROUND**</u>

Plaintiff Brodal Farms, Ltd. ("Brodal Farms") is a North Dakota corporation with its principal place of business and headquarters in or near Columbus, North Dakota. Brodal Farms is owned an operated by Lynn Brodal. Defendant Archer-Daniels-Midland Company ("ADM") is a Delaware corporation with its principal place of business and headquarters in Chicago, Illinois. Jurisdiction over this case is based upon 28 U.S.C. § 1332.

On August 31, 2021, ADM submitted a letter to the National Grain and Feed Association ("NGFA") requesting that the NGFA initiate arbitration between ADM and Brodal Farms. ADM contends Brodal Farms breached a contract with ADM by failing to tender 50,000 bushels (1133.98 metric tons) of canola, as required by the parties' written contract. ADM sought an arbitration award

against Brodal Farms in the amount of $245,008.74, along with interest and costs for ADM's resulting damages.  Brodal Farms maintains no contract existed between ADM and Brodal Farms.

Brodal Farms commenced a state court action on October 6, 2021, in the North Dakota District Court for the North Central Judicial District in Burke County, by filing a motion for termination of arbitration proceedings pursuant to N.D.C.C. § 32-39.3-05, naming ADM as the Defendant and seeking to terminate the arbitration requested by ADM.  On November 8, 2021, the case was removed to federal court pursuant to 28 U.S.C. §§ 1441 and 1332.

In late November 2020, Lynn Brodal contemplated selling between 30,000 and 50,000 bushels of canola that were being stored at his farm near Columbus, North Dakota.  Brodal had several telephone conversations in November with Toby Torkelson, an independent grain broker with Rayglen Commodities, Inc. in Saskatoon, Saskatchewan, about selling his canola, but Brodal was not interested in selling at the prices being offered.  By early December 2020, the weather was still mild and canola prices were trending upward.  Brodal Farms' hired help would be leaving at the end of December.  Brodal and his wife were planning to go to Arizona in January 2021.  Brodal also wanted to receive the income from the sale of the canola in 2020 for tax purposes.  With all these factors in mind, Brodal decided he wanted to sell the canola before the end of the year.

On December 2, 2020, Brodal again called Torkelson.  Brodal had known and worked with Torkelson for many years, having used Torkelson to sell grain on numerous occasions.  Brodal told Torkelson he was looking to sell between 30,000 and 50,000 bushels of canola before the end of the year and asked what markets were available.  The two men discussed trucks and transportation of the canola and another quote Brodal had received for the canola.  Torkelson had spoken with ADM grain merchandiser Harold Henderson earlier that day and informed Brodal he could get him a

2

contract with ADM at $18.50 per hundred-weight ("CWT").  Brodal was agreeable to the price.

After the conversation, Brodal was left with the understanding that Torkelson would work on

locating a buyer for the canola on the terms they discussed, including a December delivery date, and

then would call back to confirm the deal.  Torkelson understood that he had authority from Brodal

to sell 50,000 bushels of canola but not that the sale was limited to a December delivery.  Brodal and

Torkelson dispute whether Brodal agreed to a February delivery.

       After speaking with Brodal, Torkelson called Henderson again.  Henderson works for ADM

out of an office in Redvers, Saskatchewan.  Henderson confirmed ADM was offering to buy canola

at $18.50 CWT for processing at the ADM processing facility in Velva, North Dakota, for canola

delivered in February 2021.  ADM would pick up the canola at the Brodal farm and cover the

transportation costs.  Torkelson orally agreed, on behalf of Brodal Farms, to the sale of 50,000

bushels of canola for a February 2021 delivery, to be picked up by ADM at the Brodal farm.  After

the telephone call, Henderson called Justin Chapman, a grain merchandiser at ADM's Velva facility,

and relayed the terms of the agreement with Brodal Farms.  Chapman entered the terms of the

agreement into ADM's computer system which generated a contract confirmation bearing the

number 13984.  See Doc. No. 5-2 and 9-3.  The contract contains an arbitration clause.  The

arbitration clause provides as follows:

> NGFA RULES/ARBITRATION:   EXCEPT AS OTHERWISE PROVIDED
> HEREIN, THIS AGREEMENT SHALL BE SUBJECT TO THE TRADE RULES
> OF THE NATIONAL GRAIN AND FEED ASSOCIATION ("NGFA"), WHICH
> ARE INCORPORATED HEREIN.  THE PARTIES AGREE THAT THE SOLE
> REMEDY FOR RESOLUTION OF ANY AND ALL DISAGREEMENTS OR
> DISPUTES ARISING UNDER OR RELATED TO THIS AGREEMENT SHALL
> BE THROUGH ARBITRATION PROCEEDINGS BEFORE THE NGFA
> PURSUANT TO THE NGFA ARBITRATION RULES.  IN THE EVENT OF A
> CONFLICT BETWEEN THE NGFA TRADE RULES AND THIS AGREEMENT,

THIS AGREEMENT SHALL CONTROL. THE DECISION AND AWARD DETERMINED THROUGH SUCH ARBITRATION SHALL BE FINAL AND BINDING UPON EACH PARTY.

See Doc. No. 9-3, p. 2.

On December 2, 2020, Chapman printed and signed the contract and mailed it to Brodal from the ADM facility in Velva, North Dakota. See Doc. No. 9-3. Chapman placed the contract in the mail no later than December 4, 2020. The contract mailed to Brodal by Chapman contained all of the terms and conditions, including the arbitration clause.

On December 4, 2020, Henderson signed the contract and mailed a copy of the contract to Brodal Farms. Henderson also emailed a copy of the first page of ADM's contract confirmation to Torkelson. At 8:43 am on December 4, 2020, Torkelson forwarded the contract confirmation email to Brodal at his email address. See Doc. No. 9-5. Torkelson was aware that the sale would be governed by NGFA rules that require all disputes to be resolved via arbitration. Henderson mailed another copy of the contract to Brodal later in December. Henderson and Chapman never received any response from Brodal. Nor did Henderson or Chapman ever receive any notice that the three copies of the contract mailed to Brodal by ADM were returned as undeliverable.

Between December 3 and December 14, 2020, Torkelson did not discuss the canola sale with Brodal or receive any correspondence or objection to the sale from Brodal. On December 15, 2020, Torkelson received a text message from Brodal regarding the sale. See Doc. No. 9-2. Brodal texted: "When will canola trucks come." Torkelson responded: "They were looking to start mid January." Brodal replied: "Oh. Thought it would be now. Offda. Hoping for cash before Santa." Torkelson responded: "That was the earliest delivery they could offer. The Richardson Pioneer crusher at Yorkton is already full until May '21." Based on the exchange of text messages, Torkelson

4

understood that Brodal believed the sale had been made and he was inquiring about performance on

the contract.  Torkelson also understood that Brodal would have preferred a December delivery, but

that he did not object to the terms of the sale or the delivery period.  Brodal's understanding was that

Torkelson was not able to find a buyer for Brodal's canola with a December delivery date and no

agreement had been made with anyone for the sale of the canola.  Brodal decided he would look into

selling the canola again after the new year.

Between December 16, 2020, and January 7, 2021, Torkelson and Brodal did not have any

discussions or communication regarding the canola sale.  On January 8, 2021, Torkelson received

a text message from Brodal, in which Brodal objected to the February delivery period.  See Doc. No.

9-2.  Torkelson responded that February delivery was the earliest available.  More texts were

exchanged on January 12, 2021, which discussed Brodal's dissatisfaction with the February delivery

date and the rising prices.  On January 14, 2021, Torkelson texted Brodal and warned him he needed

to perform and ADM would enforce the contract.

On January 7, 2021, Brodal received the ADM contract in the mail.  The contract was signed

by Chapman and dated December 2, 2020.  See Doc. No. 9-3.  The contract  stated: "Please return

a signed copy by mail or fax. . . Receipt of this contract by you is an acknowledgment of acceptance

of all terms and conditions herein unless immediate notice is sent to us advising of any errors."  Id.

After receiving the contract in the mail, Brodal checked his computer to see if any other

communications from Rayglen or ADM had been sent.  Brodal discovered Rayglen had sent an email

at 5:04 p.m. on December 2, 2020, with a "Canola Purchase Confirmation" attached to the email

which contained all the details of the canola contract with ADM.  See Doc. No. 9-4.  Brodal also

discovered that Torkelson sent him an email on December 4, 2020, with a copy of the front page of

ADM contract attached.  See Doc. No. 9-5.

On January 8, 2021, Brodal texted Torkelson objecting to the contract because of the February delivery date.  See Doc. No. 9-2, p. 2-3.  Specifically, Lynn stated: "Both me and Alex are extremely distraught about the canola contract.  We understood in our conversation the sale was immediate.  The canola we were to move was in bags [sic] our plan was to move it in fair weather. We knew the offers to us was better latter months [sic] Alex [sic] good college buddy is married to the Adm buyer in Velva.  Neither one of us ever heard the feb [sic] date for delivery.  You might review that conversation.  My computer has been on fritz.  Just saw contact [sic] yesterday".  Id. Torkelson replied "I don't know, I apologize for that.  In talking with the trader that's the earliest they had available, I had said they would start the middle of the month, and I'm sure that's still the plan."  Id.

On January 12, 2021, Brodal texted Torkelson objecting to the February 2021 delivery date: "This is a difficult position I find myself in.  Neither Alex or I were aware of the canola contact [sic] being a feb delivery [sic] Our motivation to sell on dec 2 was two fold.  Grain is in bags and wanted to get cleaned up before Jan winter.  Also financial planning before end of year.  I had commitment from trucking company that they could focus on 30000 bu in a short time.  If you have a recording of this conversation that says explains the contrary we would sure like to hear it [sic] Alex gets bid from Morgan at Velva as he knows her husband well.  He knew what the bids were out in next months along with the Northgate bid [sic] This is a tough one [sic] Let me know about clarity."  See Doc. No. 9-2, pp. 5-6.  Torkelson responded by stating that he had not been in the office during the December 2 phone call so he did not having a recording of the conversation.  He also stated: "It is pretty much a given in normal years that not much happens in December, holidays

6

and such and I absolutely did not promise that would happen. . . . I also texted you with clarification to the shipping early on when you asked about getting some trucks." <u>See</u> Doc. No. 9-2, pp. 7–9.

On January 13, 2021, Torkelson texted Brodal again: "This canola thing is not going to be good for you, or anyone for that matter... it will effect you and Alex in more ways than you know. I'd think long and hard about this, lawyers opinion or not.... you will be held responsible for hedge damages and legal costs will be significant.  ADM is going to enforce that sale, and the markets you will lose access to will haunt you for the balance of your career.  It's so not worth it." <u>See</u> Doc. No. 9-2, pp. 13-14.

On January 20, 2021, ADM's Senior Legal Counsel, Alex McClanahan, sent Brodal a letter by email and express mail reciting that Brodal had not allowed ADM to schedule a pickup of the canola and urging him to perform on the contract before the end of February or ADM would pursue its legal remedies.  <u>See</u> Doc. No. 9-6.  In the letter, McClanahan noted the value of the canola was $482,500.  A copy of the contract was included with the letter.  On January 26, 2021, Brodal, through his legal counsel, responded to McClanahan's letter explaining that he did not believe he ever had a contract with ADM and the February delivery date was unacceptable to him <u>See</u> Doc. No. 9-8.

On April 1, 2021, ADM invoiced Brodal Farms for $245,008.74, for damages ADM believes it suffered from Brodal Farms' alleged breach of contract.  <u>See</u> Doc. No. 9-10.  ADM demanded this same amount in its arbitration demand, filed with the NGFA on August 31, 2021.  Brodal Farms filed a motion for termination of arbitration proceedings pursuant to N.D.C.C. § 32-39.3-05 in state court on October 6, 2021.  The case was removed to federal court on November 8, 2021.

## II.   <u>LEGAL DISCUSSION</u>

Brodal Farms contends (1) there was no contract because there was no meeting of the minds as to the delivery date and (2) the inclusion of an arbitration clause by ADM was a material alteration of the terms of the contract to which Brodal Farms did not agree.  Brodal Farms makes no challenge to the arbitration clause itself.  ADM contends the parties have a binding contract and the matter should be submitted to arbitration per the clear terms of the contract.  As the Court will explain below, the undisputed facts demonstrate a valid contract was formed between ADM and Brodal Farms by and through Brodal Farms' agent, Toby Torkelson.

The Federal Arbitration Act was enacted to establish a "national policy favoring arbitration," and the Act assures that when parties to commercial transactions agree to resolve their disputes through arbitration, such provisions will be "valid, irrevocable, and enforceable."  9 U.S.C. § 2; <u>see also</u> <u>UHC Management Co., Inc. v. Computer Sciences Corp.</u>, 148 F.3d 992, 995 (8th Cir. 1998) (citations omitted).  "A dispute must be submitted to arbitration if there is a valid agreement to arbitrate and the dispute falls within the scope of that agreement."  <u>Bank of American, N.A. v. UMB Financial Services, Inc.</u>, 618 F.3d 906, 911 (8th Cir. 2010) (quoting <u>Berkley v. Dillard's Inc.</u>, 450 F.3d 775, 777 (8th Cir. 2006)).  The Federal Arbitration Act establishes that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.  <u>Id.</u>  It is well-established that federal courts are to interpret arbitration clauses liberally and any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.  <u>Barker v. Golf U.S.A., Inc.</u>, 154 F.3d 788, 793 (8th Cir. 1998).

Arbitration is matter of contract and "a party who has not agreed to arbitrate a dispute cannot be forced to do so."  <u>Lyster v. Ryan's Family Steak Houses, Inc.</u>, 239 F.3d 943, 945 (8th Cir. 2001).

When there exists an express agreement to arbitrate, it is presumed that the parties agreed to submit disputes to arbitration unless there is a clear intent the parties did not want to arbitrate the matter. Teamsters Local Union No. 688 v. Indus. Wire, 186 F.3d 878, 881 (8th Cir. 1999). In the Eighth Circuit, the district court must decide whether the agreement to arbitrate was validly made and whether the dispute falls within the scope of the arbitration agreement. Indus. Wire Prod., Inc. v. Costco Wholesale Corp., 576 F.3d 516, 520 (8th Cir. 2009). A motion to compel arbitration which is supported by material outside the pleadings is to be evaluated under a summary judgment standard. Foster v. Walmart, 15 F.4th 860, 862 (8th Cir. 2010).

State contract law governs whether an arbitration agreement exists or is valid. Lyster, 239 F.3d at 946. Under North Dakota law, a contract, whether oral or written, requires an offer, acceptance of that offer, and mutual acceptance and understanding of the offeror and offeree as to the terms of the legally enforceable obligation incurred. Lagerquist v. Stergo, 752 N.W.2d 168, 173 (N.D. 2008). In order to form a contract there must be a meeting of the minds between the parties with respect to all of the terms and conditions, and there must be an unqualified and absolute acceptance of an offer. Davis v. Satrom, 383 N.W.2d 831, 833 (N.D. 1986) (citing Greenberg v. Stewart, 236 N.W.2d 862 (N.D. 1975)); N.D.C.C. § 9-03-21 (requiring acceptance to be absolute). The offer and acceptance must express assent to the same thing. Wucherpfennig v. Dooley, 351 N.W.2d 443, 444 (N.D. 1984).

In determining whether there has been an acceptance of an offer, the order of communications is critical to an accurate analysis of the offer, counteroffer, acceptance, modification, and the like. See B.J. Kadmas, Inc. v. Oxbow Energy, LLC, 727 N.W.2d 270, 274 (N.D. 2007). A qualified acceptance is a new proposal. See N.D.C.C. § 9-03-21; Cooke v. Blood

Sys., Inc., 320 N.W.2d 124, 128 (N.D. 1982) ("An offer to be considered accepted must be accepted

unconditionally. . . .  A conditional acceptance of an offer is in itself a counteroffer which rejects the

original offer").

      In this case, there was a clear offer and acceptance of the terms of the canola sale between

ADM and Torkelson.  Torkelson was well-aware of all the contract terms, including the arbitration

clause and the February delivery date, when he made the oral agreement with ADM for the sale of

50,000 bushels of Brodal Farms' canola.  Torkelson did not object when ADM reduced the oral

agreement to writing and both parties maintain the written agreement accurately reflects the terms

of the oral agreement.  The only real disputed question is the relationship between Brodal Farms and

Torkelson.  Specifically, whether Torkelson was acting as an agent for Brodal Farms when he

contacted ADM to sell Brodal Farms' canola and agreed to ADM's price and terms.  ADM contends

Torkelson was an actual agent for Brodal Farms.  Brodal Farms contends  Torkelson was not acting

as its agent.

      "Agency is the relationship which results where one person, called the principal, authorizes

another person, called the agent, to act for him in dealing with third persons."  Farmer's Union Oil

Co. of Dickinson v. Wood, 301 N.W.2d 129, 133 (N.D. 1980).  An agency relationship can be either

actual or ostensible.  Id.  Agency is actual when the agent is employed by the principal.  Id.  Agency

is ostensible when the principal "intentionally or by want of ordinary care causes a third person to

believe another to be his agent, who, in actuality, is not employed by the principal."  Id.; see also

N.D.C.C. § 3-02-02.  "Actual authority is such as a principal intentionally confers upon the agent

or intentionally or by want of ordinary care allows the agent to believe himself to possess.

Ostensible authority is such as the principal intentionally or by want of ordinary care causes or

allows a third person to believe the agent to possess."  N.D.C.C. § 3-02-02; Hagel v. Buckingham

Wood Prod., Inc., 261 N.W.2d 869, 874 (N.D. 1977).  A principal is bound by the agent's actual

authority and by that authority which the principal has ostensibly or apparently delegated to him.

Hagel, 261 N.W.2d at 875.

> The North Dakota Supreme Court has summarized agency law as follows:
>
> (1) One is presumed to act for himself and not as the agent of another; (2) One who
> deals with an agent does so at his peril; (3) Where the existence of an agency
> relationship is denied, the burden of proof is upon the party affirming its existence
> to establish it by clear and convincing evidence; (4) The existence of an apparent or
> ostensible agency must rest upon conduct or communications of the principal which,
> reasonably interpreted, causes a third person to believe that the agent has authority
> to act for and on behalf of the principal; and (5) A third person dealing with a known
> agent must determine for himself, by the exercise of reasonable diligence and
> prudence, the existence or nonexistence of the agent's authority to act.

Johnson v. Prod. Credit Ass'n of Fargo, 345 N.W.2d 371, 374 (N.D. 1984).

Applying North Dakota agency law, the Court concludes that Torkelson was acting as the

authorized actual agent for Brodal Farms during the relevant times at issue.  Torkelson is a grain

broker and a broker is, by definition, an agent.  Broker, Black's Law Dictionary (7th ed. 1999).

Brodal contacted Torkelson at Rayglen Commodities in late November 2020 to sell his canola.

Brodal clearly knew Torkelson was a grain broker and that Rayglen Commodities was in the

business of helping farmers find buyers for their grain.  Brodal engaged Torkelson to find a buyer

for his grain.  That was his only purpose in calling Torkelson and the purpose for which he had

engaged Torkelson many times in the past.  Brodal and Torkelson were well-acquainted with one

another as Brodal had used Torkelson as an agent  to execute fifty-one (51) commodity contracts

over an eighteen (18) year period between 2002 and 2020.  Seven (7) of those contracts were for the

sale of commodities to ADM.  Torkelson clearly states in his affidavit that he was working as an

agent for Brodal and was not employed by ADM.  See Doc. No. 15-1.  This is consistent with the undisputed fact that Brodal contacted Torkelson, as he had many times before, to sell his canola. Brodal does not deny he told Torkelson to sell his canola.  It was Torkelson who contacted ADM to sell Brodal Farms' canola.  ADM did not contact Torkelson looking for sellers.  Torkelson informed ADM that he was selling 50,000 bushels of canola for Brodal Farms.  This is reflected in Henderson's handwritten notes taken at the time of the conversation and in the written contract which memorialized the oral agreement.  ADM clearly knew Torkelson had acted as Brodal Farms agent in the past.  The only reasonable conclusion to be drawn from this is that Brodal engaged Torkelson to act as his agent to sell 50,000 bushels of his canola.  If Brodal failed to effectively communicate with Torkelson as to the terms acceptable to him it was only through his own want of ordinary care that he allowed Torkelson to believe he possessed more authority than Brodal intended. See N.D.C.C. § 3-02-02.

The Court concludes as a matter of law that the record clearly establishes that Torkleson was acting as an actual agent for Brodal Farms when he contracted for the sale of Brodal Farms' canola in December 2020.  See Red River Commodities, Inc. v. Eidsness, 459 N.W.2d 805, 810 (N.D. 1990) (recognizing that "in most circumstances notice to an agent effectively gives notice to the principal"). In addition, Torkelson was acting with ostensible or apparent authority given Brodal Farms' settled course of conduct in engaging Torkelson to sell grain on its behalf to ADM.  See Hagel, 261 N.W.2d at 874-75.  Since the Court has determined there was a valid contract between ADM and Brodal Farms and the contract contains an arbitration clause, the validity of which is not challenged, the dispute must be submitted to arbitration.

III.     <u>**CONCLUSION**</u>

For the reasons set forth above, the ADM's motion to compel arbitration (Doc. No. 4) is

**GRANTED** and Brodal Farms' motion for termination of arbitration proceedings (Doc. No. 1-2, p.

4) is **DENIED**.

      **IT IS SO ORDERED**.

Dated this 15th day of August, 2022.

*/s/ Daniel L. Hovland*      
Daniel L. Hovland, District Judge
United States District Court
